# IN THE COURT OF APPEALS OF IOWA

No. 16-0718
Filed December 21, 2016

**IN THE INTEREST OF C.M.-G.,**
**Minor Child,**

**T.G., Father,**
     Petitioner-Appellee,

**C.M., Mother,**
     Respondent-Appellant.

_____


Appeal from the Iowa District Court for Harrison County, Amy Zacharias, District Associate Judge.


A mother appeals the termination of her parental rights to her seven-year-old child under Iowa Code chapter 600A. **AFFIRMED.**


Maura C. Goaley, Council Bluffs, for appellant mother.

Jon J. Puk of Woodke & Gibbons, P.C., L.L.O., Omaha, Nebraska, for appellee father.

Mandy L. Whiddon of Whiddon Law, Council Bluffs, guardian ad litem for minor child.


Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**TABOR, Judge.**

A mother appeals the juvenile court's order terminating her parental rights to her seven-year-old son, C.M.-G. The mother contends she did not abandon C.M.-G. within the meaning of Iowa Code section 600A.8(3) (2015) and she did not fail to pay child support without good cause within the meaning of section 600A.8(4). She also argues termination of her parental rights was not in the best interests of C.M.-G. Because the evidence shows the mother failed to maintain a place of importance in her son's life, we affirm the juvenile court order.

## I.     Facts and Prior Proceedings

The mother and father have one child together, C.M.-G, who was born in 2009. The Iowa Department of Human Services (DHS) became involved with the family in March 2011 due to allegations the mother was using illegal drugs with her paramour, Beau, while C.M.-G and the mother's daughter from another relationship were in her care. The mother and father were not living together at the time. The DHS removed the two children from the mother's home and placed them with the mother's sister, Corri.

After several months, the court placed C.M.-G. with the father, largely due to the mother's renewed relationship with Beau, whom the court had ordered to have no contact with C.M.-G.; her failure to consistently attend substance-abuse treatment; and her refusal to participate in random urinalysis testing. Upon the juvenile court's authorization, the father initiated an action to establish paternity, custody, visitation, and support, and on July 16, 2012, the court granted sole legal and physical temporary custody to the father. The court ordered the mother to pay $220 a month in child support and authorized supervised visitation through

Corri. Following the order, the mother participated in some visitation with C.M.-G., but the relationship between the mother and Corri soured as a termination-of-parental-rights proceeding under chapter 232 concerning the mother's daughter moved forward.[1] Corri eventually obtained a no-contact order against the mother, which prevented the mother from visiting C.M.-G. under the supervision conditions set out in the court order.[2] The mother has not spoken with or seen C.M.-G. since the dispute arose at some point in 2013.

The mother waited until late 2014 to seek modification of the order and request a change in the visitation supervisor. Before ruling on the modification request, the district court ordered the mother to submit to a drug test. The mother tested positive for marijuana and methamphetamine, but she falsified the results to indicate a negative screen. After learning of the mother's conduct, the court issued an order on January 21, 2015, suspending visitation and requiring the mother to complete four drug tests, at the father's written request, before the court would consider resuming visitation. The court required the mother to pay for the drug testing and indicated if she failed to submit her samples within the timeframe in the order, the results would be deemed positive.

The father first requested the mother to complete drug testing on September 8, 2015. The mother did not do so. On October 19, the father submitted another request. This time the mother complied, and the results were positive for amphetamine, methamphetamine, and marijuana. The father again

---

[1] The mother's rights to her daughter were terminated in 2013, and the daughter currently resides with Corri.
[2] The juvenile court noted the parties did not ask it to take judicial notice of the file containing the no-contact order, but the parties testified the order was in place.

requested drug testing in January 2016, but the mother declined to provide a sample.[3]

In the midst of the modification proceedings, the father filed a petition to terminate the mother's parental rights on January 27, 2015. In an amended petition filed March 3, 2016, the father alleged multiple grounds for termination, including failure to pay child support and abandonment. The mother, father, and guardian ad litem (GAL) testified at the April 1, 2016 termination hearing.

At the hearing, the mother denied she had the ability to pay child support. Since the court ordered the mother to pay child support in July 2012, she made only four of her forty-five court-ordered payments: October 2012, December 2012, May 2015, and March 2016—two weeks before the termination hearing. The mother had been consistently working full-time at Wal-Mart and then at Subway since the entry of the support order, making nine dollars an hour. She estimated her monthly income at $1000 a month before taxes[4] and claimed her monthly house payment was $600, an amount she had to bear alone because Beau, who also resided there, had been laid off. But the mother maintained she would find a way to make the payments if the court did not terminate her parental rights.

---

[3] The father also submitted a request for drug testing on September 20, 2015, but the parties stipulated the mother did not receive this request due to her attorney's hospitalization.

[4] The juvenile court doubted the accuracy of the mother's estimation of her income and cited the following exchange between the father's attorney and the mother:

> Q. As far as child support, I want to make sure you understand your—you have been with Walmart full-time at [nine dollars] an hour and immediately went to Subway, [nine dollars] an hour. We talked about [forty] hours a week. So I calculated that at $1560 gross per month. And based on that income . . . you are still saying you don't have sufficient money to support your child, [C.M.-G]? A. I have bills and stuff to pay.

The mother acknowledged her struggle with drug abuse but insisted she no longer used illicit substances. She stated she did not complete drug testing in September or January because she could not afford it. And although she admitted to a relapse in the fall of 2015 around the time of her positive drug test in October, the mother insisted she was drug free at the April 2016 hearing.

The mother blamed her lack of contact with C.M.-G. on the father. She testified that after the court granted him custody of C.M.-G., she contacted the father every day regarding C.M.-G. She produced a series of almost daily text messages from January to April 2014 in which she asked to speak with C.M.-G. She claimed the father would not allow her to see or speak with the child. The father disputed the mother's claim he had prevented contact. He claimed that after her dispute with Corri, the mother did not contact him about visitation until the text messages in 2014. He insisted he called in response to the text messages but the mother never answered.

The GAL recommended termination based on concerns about the mother's continued drug use, her failure to pay child support, and the length of time since the mother's last contact with C.M.-G. The GAL added: "[W]hen I interviewed [C.M.-G.], in his mind, his step-mom, Jessica, is his mom."

In a detailed and thorough opinion, the juvenile court considered the credibility of the parties. The court was skeptical of the mother's estimation of her finances and her claim she could not afford the child support payments, noting:

> [The mother] recently made a child support payment. She did not testify that as a result of that payment she was unable to pay her other bills or make her house payment as she claimed would

happen if she paid child support. The most recent child support payment appears to be a weak attempt to convince the Court she has changed and is willing to make child support payments in the future.

Similarly, the court considered the credibility of the mother and father related to the mother's claims the father had prevented her from contacting C.M.-G. and found the father's testimony more credible. The juvenile court terminated the mother's parental rights on the grounds of abandonment and failure to pay child support. The mother now appeals.

## II.     Standard of Review

We review termination-of-parental-rights proceedings under chapter 600A de novo. *In re R.K.B.*, 572 N.W.2d 600, 601 (Iowa 1998). We give weight to the juvenile court's fact findings, particularly concerning witness credibility, but we are not bound by those findings. *See id.* The petitioning party must prove the statutory grounds for termination with clear and convincing evidence. *See In re E.K.*, 568 N.W.2d 829, 831 (Iowa Ct. App. 1997). Although the best interests of the child are "paramount" in our analysis, we also give "due consideration" to the interests of the parents. *See* Iowa Code § 600A.1.

## III.     Analysis

The juvenile court cited two grounds for termination: failure to contribute to the child's support (section 600A.8(4)) and abandonment (section 600A.8(3)(b)). When a juvenile court terminates parental rights on more than one ground, we may affirm the order on any of those grounds. *See In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010). Upon our de novo review, we find clear and convincing evidence the mother abandoned C.M.-G. under section 600A.8(3)(b).

**Abandonment.** The mother argues she did not abandon C.M.-G. because: (1) she provided support to C.M.-G. to the extent of her ability to pay and (2) the father prevented her from all contact with C.M.-G.

The Iowa Code defines "to abandon a minor child" as a parent "reject[ing] the duties imposed by the parent-child relationship . . . which may be evinced by the person, while being able to do so, making no provision or making only a marginal effort to provide the support of the child or to communicate with the child." *See* Iowa Code § 600A.2(19). We consider the parent of a child who is six months or older to have abandoned the child unless the parent maintains "substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means," and—if the parent has not lived with the child in the year before the termination hearing—by (1) visits with the child at least once a month when physically and financially able and when not prevented by the child's custodian or (2) regular communication with the child or their custodian when physically and financially unable to visit or when visits are prevented by the child's custodian. *See id.* § 600A.8(3)(b).

First, we consider the mother's economic contributions to the support of C.M.-G. The threshold language of Iowa Code section 600A.8(3)(b) requires a parent to contribute a reasonable amount to the support of the child to prevent a finding of abandonment, regardless of whether the court has ordered the parent to pay support. *See In re W.W.*, 826 N.W.2d 706, 710–11 (Iowa Ct. App. 2012). Reasonable support is not limited to support ordered by the court. *See id.* at 710; *see also In re T.K.*, No. 16-0029, 2016 WL 4384869, at *2–3 (Iowa Ct. App.

Aug. 17, 2016) (finding father, who consistently paid court-ordered child support of ten dollars a month, did not contribute reasonable support). In the nearly four years between the entry of the child-support order and the termination hearing, the mother maintained steady employment, yet she made only four payments towards C.M.-G.'s support. And she made no payments in either 2013 or 2014. Like the juvenile court, we are not convinced by the mother's testimony she was unable to provide additional support in any amount. Nor do we find the mother's support of Beau—who was unemployed and continued to live with the mother despite the court order prohibiting his contact with C.M.-G.—to be a valid excuse for her failure to provide funds for her child. The mother's sporadic payments fell well short of a reasonable contribution to the support of C.M.-G. Accordingly, we find the mother has abandoned C.M.-G. under the predicate language of section 600A.8(3)(b). *See W.W.*, 826 N.W.2d at 710.

Even assuming the mother's failure to provide financial support does not resolve the matter, we would still find the mother abandoned the child under sections 600A.2(19) and 600A.8(3)(b)(1) for failing to visit C.M.-G. since 2013.[5] In July 2012, the district court granted the mother visitation under Corri's supervision. After Corri's no-contact order prevented the mother from continuing this plan, the mother did not seek modification of the court's visitation order for several months, and as indicated by the test results following her request to

---

[5] The mother does not argue she was physically or financially unable to visit C.M.-G. She argues that the father prevented her from communicating with or visiting C.M.-G. Because we find the father did not prevent visitation, it is not necessary to reach the mother's argument under section 600A.8(3)(b)(2) that she attempted regular communication with C.M.-G. *See In re G.A.*, 826 N.W.2d 125, 130 (Iowa Ct. App. 2012) (construing section 600A.8(3)(b)(1)–(2) to provide that only when a parent is "physically and financially unable to visit or when the child's custodian prevents visitation" does section 600A.8(3)(b)(2) apply).

modify, the mother continued to abuse illegal substances—the same behavior that prompted C.M.-G.'s removal in 2011.

The mother's only other demonstrated efforts to contact C.M.-G. were text messages sent to the father in early 2014. In those messages, the mother did express a desire to speak with C.M.-G, but she neither requested visitation nor suggested an alternate person to supervise visitation. The messages signaled an ongoing interest in the child but were not focused attempts to re-establish visitation. To the extent the messages could be considered requests for visitation, we defer to the juvenile court's finding crediting the father's testimony he responded by phone and the mother did not return his calls. Accordingly, the record does not support the mother's argument the father prevented her from visiting C.M.-G. Rather, the mother's own inaction—failing to take meaningful steps to re-establish visitation or address her substance abuse—kept her from visiting her child. *See id.* at 708, 711 (finding mother abandoned children when she waited two years after the parties moved to Iowa "to obtain a modification of the visitation portion of [a Texas] divorce decree" to allow Iowa organizations to serve as visitation supervisors and took no additional action to re-establish visitation when it became clear the Iowa supervisors were not suitable).

**Best Interests.** Finally, the mother argues the juvenile court wrongly decided termination of her parental rights was in C.M.-G.'s best interests because "there was no evidence presented to indicate how the child would be affected" by the termination. We disagree. Under Iowa Code section 600A.1, "[t]he best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent." In making this

determination, we consider: "the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life." *See* Iowa Code § 600A.1.

Ample evidence points to the diminished relationship between C.M.-G. and the mother. By the time of the April 2016 termination hearing, the mother had not seen or spoken with C.M.-G. since 2013. The GAL testified C.M.-G. viewed his step-mother as his mother. Further, the mother persisted in the behavior that necessitated C.M.-G.'s removal from her care in 2011. She continued to reside with Beau and planned to maintain that relationship if her parental rights were not terminated. Like the juvenile court, we find it "deeply concerning" that the mother would prioritize her relationship with Beau over her relationship with C.M.-G. And as demonstrated by her failed drug tests, the mother continued to struggle with substance abuse. Taken as a whole, this evidence leads us to the conclude termination of the mother's parental rights is in C.M.-G.'s best interests.

Accordingly, we affirm the juvenile court's termination of the mother's parental rights.

**AFFIRMED.**